**\* NOT FOR PUBLICATION \***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

—————————————————————
                                          :
MARY BETH NEIL PUCCA, and                 :
ANTHONY L. PUCCA,                         :
                                          :
            Plaintiffs,                    :
                                          :
      v.                                   :          Civ. Action No. 12-4640 (FLW)
                                          :
CITY OF LONG BRANCH, MATT                 :          **OPINION**
BOGNER, RICK STIMPSON,                    :
LAWRENCE IRVING, COLIN                    :
CALLAHAN, TYLER KIMBLE,                   :
JOHN DOE 1-10 and ABC CORPS. 1-10,        :
                                          :
            Defendants.                    :
—————————————————————:

**WOLFSON, United States District Judge:**

Plaintiff Mary Beth Neil Pucca ("Plaintiff, or "Mrs. Pucca") claims she was struck

by a beachgoer on a wooden boogie board at Chelsea Beach in Long Branch, New Jersey

on July 25, 2010, which allegedly resulted in a broken right leg. Mrs. Pucca and her

husband, Anthony L. Pucca[1] ("Mr. Pucca") (collectively, "Plaintiffs" or the "Puccas") filed

an Amended Complaint against Defendants Matt Bogner ("Bogner")[2], Rick Stimpson

("Stimpson"), Colin Callahan ("Callahan"), Tyler Kimble ("Kimble"), and Lawrence

Irving ("Irving") (collectively, "Lifeguard Defendants") and City of Long Branch ("Long

---

[1]      For the purposes of these motions for summary judgment, the Court will refer to
Mrs. Pucca as the sole Plaintiff in this matter, because the motions only concern her claim
of negligent supervision.

[2]      Plaintiff, in her opposition brief, stated that the parties have agreed to dismiss
Bogner as a defendant. Pl.'s Opp. Br. at 1 n.1.

1

Branch") (all defendants collectively referred to as "Defendants"), asserting a claim of negligent supervision of a recreational facility under New Jersey law on behalf of Mrs. Pucca, as well as a lack of consortium claim on behalf of Mr. Pucca.

Presently before the Court is (1) Plaintiff's motion for partial summary judgment on liability and (2) Defendants' cross-motion for summary judgment. For the reasons set forth below, Defendants' motion for summary judgment on the basis of immunity is (1) **GRANTED IN PART**, as to Lifeguard Defendants' claim of immunity under N.J.S.A. 59:3-11 for failure to enforce an ordinance, and (2) **DENIED IN PART**, as to Lifeguard Defendants' claims of immunity under N.J.S.A. 59:4-9 and 59:3-2(a) and Long Branch's claim of immunity under N.J.S.A. 59:2-2. Further, the remainder of Defendants' motion for summary judgment as it relates to Stimpson and Callahan[3] is also **DENIED**. Finally, Plaintiff's motion for partial summary judgment is **DENIED**.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

**A. Mrs. Pucca's Accident**

The following facts are undisputed, unless otherwise indicated. On July 25, 2010, Mr. and Mrs. Pucca traveled from their residence in White Plains, New York to Chelsea Beach in Long Branch, New Jersey with their two-year-old daughter and two friends, Marlene Ramos and Erol Rodriguez. See Defendants' Statement of Material Facts Not In Dispute in Support of Their Motion for Summ. Judgn't. ("Defs.' Facts") at ¶¶ 22-23; Plaintiff's Statement of Undisputed Material Facts ("Pl's. Facts") at ¶ 1. Upon arrival, the Puccas arranged their beach equipment between the Chelsea Beach Lifeguard Chairs I and

---

[3]      Kimble and Irving only move for summary judgment on immunity grounds with all Defendants.

II, and then they went into the ocean with their daughter. Pl's. Facts at ¶¶ 7-8; Defs.' Facts at ¶ 23. Both parties agree that the beach was crowded that day and that Chelsea Beach is the most crowded beach in the immediate vicinity.[4] Pl's. Facs at ¶¶ 2, 33; Defs.' Response to Pl's. Statement of Undisputed Material Facts ("Defs.' Response to Pl's. Facts") at ¶¶ 2, 33. Daniel George, ("George"), the Beach Manager, stated that approximately five hundred people probably were in the ocean that day. Pl's. Facts at ¶ 60; George Dep. 55:2.

While playing with her daughter, Mrs. Pucca was standing in ankle deep water; she was facing north, and the ocean was located on her right hand side. Pl's. Facts at ¶ 8; Defs.' Facts at ¶ 25. "[A]t the last minute, [Mrs. Pucca] saw a young guy laying on a board coming at her very fast." Defs.' Facts at ¶ 25. Defendants admit that an accident occurred involving Mrs. Pucca; however, Defendants dispute Plaintiffs' account of Mrs. Pucca's accident as well as the extent of the injury Mrs. Pucca claims to have suffered as a result of the accident. See Defs.' Facts at ¶¶ 22-29; Defs.' Response to Pl's. Facts at ¶¶ 7-8, 10-11, 62-65. Defendants do admit that Mrs. Pucca said she was hit by someone on a boogie board, and that Mrs. Pucca told Long Branch employee Bogner, the emergency medical technician ("EMT"), who attended to her in the wake of her accident, that she was hit by a "body board" when she was standing in the water.[5] Pl's. Fact at ¶ 45; Defs.' Response to Pl's.

---

[4]    The Puccas allege that they noticed that the ocean "in front of the lifeguard stands was full of swimmers, surfboards, boogie boards and skim boards. There were long surfboards, boogie boards and skim boards being used in the swimming area to ride waves as it was very crowded with lots and lots of swimmers." Pl's. Facts at ¶ 5. However, Defendants dispute this contention. Defs.' Response to Pl's. Facts at ¶ 5.

[5]    It is unclear whether Mrs. Pucca was struck with a "boogie board" or a "skim board." In their Amended Complaint, the Puccas refer to the board as a "skimmer." Pls. Am. Compl. at ¶ 12. For the purpose of these motions, Mrs. Pucca states that she was struck by a wooden "boogie board," and they maintains that any distinction between a "boogie board" and a "skim board" is immaterial. Defendants, however, dispute the contention that

Facts at ¶¶ 13, 45. Mrs. Pucca testified that after the accident, two lifeguards, one of whom she believes was a supervisor, came up to her and "yelled to all surfers and boarders to get out, leave the area." Mrs. Pucca Dep. 41:6-25.

At some point, someone contacted emergency services and EMTs, including Bogner, arrived on the scene.[6] Defs.' Facts at ¶ 4; see Pl's. Facts at ¶ 45. As a result of the incident, Mrs. Pucca claims to have "suffered a comminuted impacted, depressed, displaced fracture of the right lateral tibial plateau, with depression of the articular surface." Id. at ¶ 62. She further claims to have undergone multiple surgeries to correct her injury. Id.; see also Pl's. Exh. 19-26 (medical evidence). Even after the surgeries, Mrs. Pucca claims that she experiences pain and swelling in her right leg. Id. at ¶ 63. She further claims to have significant difficulties performing routine activities, such as cleaning and driving. See id. at ¶¶ 63-65.[7]

### B. Long Branch and Defendants' Testimony

Long Branch is a public entity that controls eleven beaches, including Chelsea Beach. Defs.' Facts at ¶¶ 3, 11. The eleven Long Branch beaches are regulated by the Code of the City of Long Branch, which contains municipal ordinances for Beaches at Chapter 116, Section 116-5 (the "Local Ordinance"). Id. at ¶ 14; Pl's. Facts at ¶ 17. The Local Ordinance provides, in pertinent part, that:

---

Mrs. Pucca was hit by a wooden board and do distinguish between boogie boards and skimboards. Defs.' Response to Pl's. Facts at ¶ 8; see also George Dep. 61:16-25.

[6]     Plaintiffs claim that the young man who struck Mrs. Pucca "ran off." See Pl's. Facts at ¶ 13. The young man's identity was apparently never discovered.

[7]     As aforementioned, Defendants dispute Mrs. Pucca's account of her injuries but, in any event, assert that the extent of Mrs. Pucca's injuries "are not material to Plaintiff['s] motion." Defs.' Response to Pl's. Facts at ¶¶ 62-65.

> No person shall use surfboards, rafts, or other swimming apparatus upon the protected public bathing beaches or in the waters adjacent thereto at any time lifeguards are on duty. Any person using a surfboard, raft or other swimming apparatus within 300 feet of a protected bathing area shall do so only after securing such surfboard, raft or swimming apparatus to his or her arm or leg with a surf leash and shall cease the use of such surfboard, raft or other swimming apparatus within that area upon being directed to by a lifeguard on duty.

Defs.' Ex. H. The Long Branch lifeguards also "set up [the Chelsea Beach] each day by placing blue flags by the shoreline to designate the area for 'swimmers.'" Defs.' Facts at ¶ 21. Mrs. Pucca admits that she did not notice the blue flags designating the swimming area when she was on Chelsea Beach or in the water. Defs.' Facts at ¶ 24; Pl's. Response to Defs.' Facts at ¶ 24.

On the date of the incident, Long Branch employed Carl Jennings ("Jennings") as the Director of Recreation and Human Services, the department which oversees the operation of the beaches. See Defs.' Facts at ¶¶ 3, 10-12. Long Branch also employed Daniel George as the Beach Manager, and he reported directly to Jennings. Id. at ¶¶ 9, 13. In addition to the Director and the Beach Manager, Long Branch employed several lifeguards to patrol the Chelsea Beach on the date of the incident, including named Defendants Stimpson, Callahan, Irving, and Kimble (collectively, the "Lifeguard Defendants"). Id. at ¶¶ 5-8.

Jennings stated in his deposition that a boogie board might be prohibited under the Local Ordinance because a boogie board can be used to ride the waves. Id. at ¶ 18; see Pl's. Ex. 33. In addition, George confirmed in his deposition that he was not aware of any Long Branch employee that witnessed the incident. Pl's. Facts at ¶ 56; see George Dep. 26:11-13. Regarding the beach policies, George outlined the responsibilities of a Long Branch

lifeguard in his deposition: "They are sitting in the stand . . . . They are scanning the water, they are looking for potential situations, looking at risk, high risk areas, and just keeping an eye on the people between the flags . . . . They are routinely scanning and looking for situations that are out of the ordinary." George Dep. 32:7-22. In regard to the protected bathing areas, George stated that he believed that boogie boards may not be prohibited by the Local Ordinance as a swimming apparatus; however, surfboards, skim boards, and rafts are prohibited. Pl's. Facts at ¶ 59; see George Dep. 57:4-8 ("[T]he boogie board, is it a swimming apparatus, is it not, it's up for, I think, debate on what you feel other swimming apparatus is."). George characterized the decision as to whether allow boogie boards within the protected area as a "day-to-day" decision. Pl's. Facts at ¶ 61; George Dep. 61:23. George further stated that he did not consider boogie boards to be "really a danger. They are basically Styrofoam and they haven't really hurt anybody." George Dep. 46:16-18.

On July 25, 2010, Rick Stimpson ("Stimpson") was the Head Lifeguard on duty at Chelsea Beach, and he maintained a supervisory role over the other lifeguards. Defs.' Facts at ¶ 5. Stimpson testified in his deposition that although he did not see the incident, he did respond to the scene after being radioed by another lifeguard. See Stimpson Dep. 13:19, 19:6. While Stimpson recalls that the beach was crowded that day, he recalled only few details relating to Mrs. Pucca's accident. The details he recalled included the fact that he (1) followed up on the call by riding to Chelsea Beach, (2) came to scene of the accident, at the water's edge, and then (3) saw a woman being attended to by Bogner, the EMT. Stimpson Dep. 13:18-19, 14:8-13. As to the Local Ordinance, Stimpson professed that he was unfamiliar with the specific ordinance at issue. Stimpson Dep. 33:6-11. However, he separately stated that boogie boards, with or without fins, are not prohibited within the blue

flags that designate the area for swimmers, though skim boards are prohibited, because, according to Stimpson, they are more dangerous. Pl's. Facts at ¶¶ 52-54; see Stimpson Dep. 30:9-11, 31:5-15. Stimpson stated that people who use boogie boards in the area for swimmers are not disciplined for so doing. Pl's. Facts at ¶ 53; Stimpson Dep. 30:21-24.

Colin Callahan ("Callahan") was a lifeguard at Chelsea Beach on the day of the incident, and he was assigned to Chelsea Beach Lifeguard Chair I. Defs.' Facts at ¶ 7. Callahan testified that he did not see the incident, and he does not have any recollection of the incident; he claims he "could have been on break" when the incident occurred. Defs.' Facts at ¶ 29; Pl's. Facts at ¶ 36; Callahan Dep. 22:12-13. With respect to the beach policies, Callahan testified that he was not familiar with the local ordinance in question, though he may have been told about it when he first began his job as a lifeguard. Callahan Dep. 49:10-13. However, Callahan stated that riding waves with a boogie board is prohibited within the area for swimmers unless a child is using a boogie board under the supervision of his or her parent. Pl's. Facts at ¶ 39; Callahan Dep. 27:18-28:4. Callahan further stated that his supervisors often instructed the lifeguards that people using boogie boards and other swimming apparatuses are not allowed within the blue flags that designate the area for swimmers. Pl's. Facts at ¶ 43; Callahan Dep. 34:14-16. Callahan further stated that lifeguards actively monitor the ocean to prevent people using boogie boards and other swimming apparatus from entering the area for swimmers. In that connection, Callahan said that the lifeguards frequently reprimand boarders located in the protected swimming area. Id. at ¶ 40, 42; Callahan Dep. 27:13-18. Although he did not see the incident, Callahan assumed that Mrs. Pucca was injured outside of the blue flags. Pl's. Facts at ¶ 41; Callahan Dep. 33:22-34:3.

Lawrence Irving ("Irving") was a lifeguard at Chelsea Beach on the day of the incident, and he was assigned to Chelsea Beach Lifeguard Chair I. Defs.' Facts at ¶ 6. In that connection, Irving, in his deposition, testified that he did not see the incident, did not have any recollection of it, and did not recall Mrs. Pucca's location with respect to the protected bathing area. Pl's. Facts at ¶ 27; see Irving Dep. 21:-17. With respect to beach policies, Irving testified that three lifeguards are typically assigned to a beach. Pl's. Facts at ¶ 25; Irving Dep. 12:7-13. Irving stated that skim boards and boogie boards with fins, or "skegs," are prohibited within the area for swimmers; however, boogie boards without fins are not prohibited within the area for swimmers. Pl's. Facts at ¶ 31; Irving Dep. 34:1-14. Irving further stated that if the Chelsea Beach is crowded, rafts and boogie boards without fins are generally prohibited in the area for swimmers. Pl's. Facts at ¶ 32; Irving Dep. 36:13-16.

On the day of the incident, Tyler Kimble ("Kimble") was a lifeguard at Chelsea Beach, and he was assigned to Chelsea Beach Lifeguard Chair I. Id. at ¶¶ 8, 22. Kimble testified in his deposition that he did not remember seeing the incident. Kimble Dep. 28:12-14. However, he testified that he did see Mrs. Pucca walk off the beach with a little assistance and walk "back to where the car took her off the beach." Id. at ¶ 22; see Irving Dep. 28:7-11. Kimble assumed that Mrs. Pucca was most likely in the area for swimmers when the accident occurred. Id. at ¶ 24. According to Kimble, the protected bathing area spans three different Chelsea Beach Lifeguard Chairs, including Lifeguard Chair I. Id. at ¶ 20. Regarding beach policies, Kimble stated that boogie boards and other apparatuses are generally prohibited in the area for swimmers, though he has no recollection of any boogie boards or skim boards being used in the protected bathing areas at the time of the incident

8

or where Mrs. Pucca was located at the time of her accident. Id. at ¶¶ 21, 23; Irving Dep. 38:12-39:12.

### C.  Procedural History

On July 24, 2012, Plaintiffs filed their original Complaint against Defendants in this Court. However, Plaintiffs subsequently amended their Complaint on January 16, 2013. Thereafter, Mrs. Pucca filed a motion for partial summary judgment on liability. Plaintiff claims that the Lifeguard Defendants are liable, as a matter of law, for negligent supervision of a recreational facility, and that Long Branch is vicariously liable for the Lifeguard Defendants' negligent supervision.

That same day, Defendants filed a cross-motion for summary judgment to dismiss Plaintiff's claim for negligent supervision of a public recreational facility. Defendants claim that both Lifeguard Defendants and Long Branch are entitled to immunity under the New Jersey Tort Claims Act ("NJTCA"); in the alternative, Stimpson and Callahan claim that Plaintiff cannot establish a negligent supervision claim, against them as a matter of law, because they did not undertake supervision of the beach.

## STANDARD OF REVIEW

A moving party is entitled to judgment as a matter of law where there is no genuine issue as to any material fact. See Fed R. Civ. P. 56(c); Brooks v. Kyler, 204 F.3d 102, 105 n.5 (3d Cir. 2000) (citing FED R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)); Montone v. City of Jersey City, 709 F.3d 181, 189 (3d Cir. 2013). The burden of demonstrating the absence of a genuine issue of material fact falls on the moving party. See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 305 (3d Cir. 1999). Once the moving party has satisfied this initial burden, the opposing party must identify "specific facts which

demonstrate that there exists a genuine issue for trial." <u>Orson, Inc. v. Miramax Film Corp.</u>, 79 F.3d 1358, 1366 (3d Cir. 1996).

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates a genuine issue of material fact. <u>See</u> Fed. R. Civ. P. 56(e); <u>Anderson</u>, 477 U.S. at 249 (citing <u>First Nat'l Bank v. Cities Serv. Co.</u>, 391 U.S. 253, 290 (1968)). In conducting a review of the facts, the non-moving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. <u>Hip Heightened Indep. & Progress, Inc. v. Port Auth. of New York & New Jersey</u>, 693 F.3d 345, 351 (3d Cir. 2012). Accordingly, it is not the Court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. <u>See</u> <u>Brooks</u>, 204 F.3d at 105 n.5 (citing <u>Anderson</u>, 477 U.S. at 249); <u>Big Apple BMW v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).

## **DISCUSSION**[8]

The Court will first examine whether Defendants are entitled to summary judgment on immunity grounds before proceeding to the question of whether either Plaintiff or Defendants are entitled to summary judgment on the merits of Plaintiff's negligent supervision claim.

---

[8]     Since the briefs for both motions contain substantial overlap, the Court will address their arguments in tandem.

### A. Immunity

In 1970, the New Jersey Supreme Court abrogated common law sovereign immunity in tort cases against public entities. <u>See</u> <u>Frugis v. Bracigliano</u>, 177 N.J. 250, 275 (N.J. 2003). In response, the New Jersey Legislature enacted the NJTCA, "which restored *limited* sovereign immunity in such cases." <u>Id.</u> (emphasis in the original). "Generally, immunity for public entities is the rule and liability is the exception." <u>Fluehr v. City of Cape May</u>, 159 N.J. 532, 539 (N.J. 1999). Importantly, a municipality "falls within the purview of the [NJTCA]." <u>Id.</u> In contrast, however, "immunity of a public employee under [NJTCA] is the exception." <u>Id.</u> Pursuant to N.J.S.A. 59:3-1(a), "[e]xcept as otherwise provided by [the NJTCA], a public employee is liable for injuries caused by his act or omission to the same extent as a private person." N.J.S.A. 59:3-1(a). As such, "[a]ny immunity provided a public employee must be independent of a public entity's immunity under the [NJTCA]." <u>Fluehr</u>, 159 N.J. at 540. "The source of a public employee's immunity can be the [NJTCA] itself, N.J.S.A. 59:3-1b, or any other statute or common law." <u>Id.</u> Finally, the party seeking immunity under the NJTCA "bears not only the burden of pleading it but also the burden of persuasion." <u>Vanchieri v. N.J. Sports & Exposition Auth.</u>, 104 N.J. 80, 87 (N.J. 1986). "When both liability and immunity appear to exist, the latter trumps the former." <u>Tice v. Cramer</u>, 133 N.J. 347, 356 (1993)

As a threshold matter, the Court notes that the NJTCA expressly sanctions a negligent supervision claim against a public employee. N.J.S.A. 59:3-11, which pertains to recreational facilities, states that "[a] public employee is not liable for the failure to provide supervision of public recreational facilities. Nothing in this section exonerates a public employee for negligence in the supervision of a public recreational facility." <u>Id.</u>; <u>see also</u>

Kowalsky v. Long Beach Twp., 72 F.3d 385, 391 (3d Cir. 1995) ("The second sentence of N.J.S.A. 59:3–11 neither creates liability, nor provides defenses or immunities, for negligent supervision. This is left to other statutory provisions . . . ."). While N.J.S.A. 59:3-11's immunity extends to a public employee's failure to provide supervision, it is well-established that the immunity does not apply once a public employee does undertake supervision and that such supervision, once undertaken, is to be conducted in a non-negligent manner. Id.

**i. Whether The Lifeguard Defendants Are Entitled To Immunity**

Since the NJTCA provides immunity to "a public entity from vicarious liability for the acts or omissions of its employees who are immunized by the [NJTCA]," S.P. v. Newark Police Dep't, 428 N.J. Super. 210, 221 (App. Div. 2012), the Court will begin by addressing the immunities asserted by Lifeguard Defendants. The Lifeguard Defendants argue that they are entitled to immunity under NJTCA because a public employee is not liable for: (1) injuries caused by the natural condition of any unimproved public property, see N.J.S.A. 58:4-8, (2) the exercise of judgment or discretion vested in a public employee, see N.J.S.A. 59:3-2(a), and (3) the failure to enact and enforce any law, see N.J.S.A. 59:3-5.

First, Lifeguard Defendants suggest that "[i]mmunity should . . . apply for the employee . . . if the alleged injury was caused by a natural condition of the recreational property, such as a wave." Defs.' Br. in Supp. of Mot. for Summ. Judgm't. at 5 (citing N.J.S.A. 59:4-8). The NJTCA states, in pertinent part, that "[n]either a public entity nor a public employee is liable for an injury caused by a condition of any unimproved public property, including but not limited to any natural condition of any lake, stream, bay, river

or beach." N.J.S.A. 59:4-8. "Underlying these determinations is the New Jersey legislature's policy judgment that the public should be permitted to use unimproved public property in its natural condition, but under the cloak of immunity." Kowalsky v. Long Beach Twp., 72 F.3d 385, 388 (3d Cir. 1995); see Bilyeu v. City of Ocean City New Jersey, 199 Fed. App'x 182, 185 (3d Cir. 2006). "Otherwise, the burdens and expenses of putting such property in safe condition as well as the expense of defending claims for injuries might cause public entities to close these areas to public use altogether." Id. In determining whether to apply immunity, "the New Jersey Supreme Court explained '[p]ublic property is no longer 'unimproved' when there has been substantial physical modification of the property from its natural state, and when the physical change creates hazards that did not previously exist and that require management by the public entity.'" Kowalsky, 72 F.3d at 388 (quoting Troth v. State, 117 N.J. 258, 270 (N.J. 1989)).

However, Plaintiff contends that N.J.S.A. 59:4-8 is not applicable because her injury was not caused by a natural condition of Chelsea Beach, and the Court agrees that Lifeguard Defendants' reliance on N.J.S.A. 59:4-8 is misplaced. Plaintiff does not claim that her injury was caused by a condition of any unimproved public property, such as a wave; at the time of Plaintiff's accident, Plaintiff was standing in ankle deep water. Defs.' Facts at ¶ 25. Rather, Plaintiff claims that she was injured by a person riding a boogie board. See Kleinke v. City of Ocean City, 163 N.J. Super. 424, 431 (Ch. Div. 1978), overruled on other grounds by Sharra v. City of Atl. City, 199 N.J. Super. 535 (App. Div. 1985). (N.J.S.A. 59:4-8 "clearly applies to the physical condition of the premises itself, [n]ot to the superimposition of an artificially created hazard thereon."). Moreover, Plaintiff's claim does not implicate the policy concerns underlying the New Jersey

Legislature's determination to provide immunity under the NJTCA for unimproved properties. See Kowalsky, 72 F.3d at 388. Since the injury was not caused by a condition of an unimproved public property, the Court finds that Lifeguard Defendants are not entitled to immunity pursuant to N.J.S.A. 59:4-8.

Next, Lifeguard Defendants argue that a public employee is entitled to immunity for his exercise of judgment or discretion. The NJTCA states, "A public employee is not liable for an injury resulting from the exercise of judgment or discretion vested in him." N.J.S.A. 59:3-2(a). However, the New Jersey Supreme Court has explained that this provision is limited "to discretion exercised at the highest levels of government in matters of policy and planning." Tice, 133 N.J. at 366; see Costa v. Josey, 83 N.J. 49, 55 (1980) (stating that "the 'exercise of . . . discretion' in N.J.S.A. 59:2-3(a) refers to actual, high-level policymaking decisions involving the balancing of competing considerations"); see also Coyne v. DOT, 182 N.J. 481, 489 (2005).

In Tice, the New Jersey Supreme Court held that the conduct of a New Jersey police officer during a high-speed chase of a fleeing motorist was not entitled to immunity pursuant to N.J.S.A. 59:3-2(a). Id. In reaching that determination, the court noted that decisions made by the officer regarding his or her conduct were "infinitely distant from high-level policy or planning decisions" and that labeling such decisions as discretionary "would end all public employee liability, or practically all, for hardly any acts or omissions are not subject to some judgment or discretion." Tice, 133 N.J. at 367; see Anderson v. Cnty. of Salem, No. 09-4718, 2010 WL 3081070, at *10 (D.N.J. Aug. 5, 2010).

Here, it is clear that Lifeguard Defendants were not engaging in high-level policymaking decisions or planning decisions. See Youn Wha Jung v. Vill. of Ridgewood,

14

No. A-4007-11T2, 2014 WL 7483599, at *10 (N.J. Super. Ct. App. Div. Jan. 8, 2015) (holding that the defendant lifeguards were not entitled to immunity under N.J.S.A. 59:3-2(a) for failing to "scan or sweep their respective zones to identify swimmers in distress" because the defendant "failed to establish that the lifeguards' duty to scan involved high-level policymaking decisions"); see also Tice, 133 N.J. at 367. Accordingly, Lifeguard Defendants are not entitled to immunity under N.J.S.A. 59:3-2(a).

Third, Lifeguard Defendants argue that to the extent that the Court accepts that (1) Plaintiff's injuries were caused by having been hit with a boogie board and (2) the presence of such boards in the protected bathing area violates the Local Ordinance, "the [NJTCA] specifically immunizes public entities and their employees for a failure to enact or enforce any law." Defs.' Br. at 5. In response, Plaintiff argues that N.J.S.A. 59:3-5 has "never been applied in such a situation and certainly do[es] not apply in this case," and thus, the Lifeguard Defendants are not entitled to immunity. Pl's. Br. in Opp. to Summ. Judgm't. at 12. In the alternative, Plaintiff argues that "[e]ven without the [Local Ordinance] and beach rules, the collective negligence of Defendants allowing boarding activity of all kinds to take place through throngs of crowded bathers in a protected area would be sufficient to find them liable to Plaintiff[]." Id.

The NJTCA states that, "[a] public employee is not liable for an injury caused by his adoption of or failure to adopt any law or by his failure to enforce any law." N.J.S.A. 59:3-5; see N.J.S.A. 59:2-4 ("A public entity is not liable for any injury caused by adopting or failing to adopt a law or by failing to enforce any laws"). Importantly, public employees "are not liable for their 'failure to enforce safety ordinances, regulations or the law generally.'" Saldana v. DiMedio, 275 N.J. Super. 488, 496-497 (App. Div. 1994) (quoting

Margolis and Novick, Claims Against Public Entities (1994), Comments to N.J.S.A. 59:2-4 and N.J.S.A. 59:3-5). Here, the Court finds that the Local Ordinance to be a safety ordinance.

"The meaning encompassed by 'failure to enforce a law' under N.J.S.A. 59:3-5 is not self-explanatory. The language itself reasonably suggests that the essential conduct constituting failure to enforce a law would consist of a failure to act, an omission, or non-action." Bombace v. City of Newark, 125 N.J. 361, 373 (1991). In that connection, "application of the absolute immunity under the [NJTCA] is determined by whether the critical causative conduct by the government [or, municipal] employees consists of non-action or the failure to act with respect to the enforcement of the law." Id. at 373. The immunity provided under this provision extends to ministerial as well as discretionary acts. S.P., 428 N.J. Super. at 233.

While Plaintiff is correct in stating that N.J.S.A. 59:3-5 has never been applied under these specific circumstances, this section has been cited as immunizing public employees from liability in a number of similar situations. See Sharra v. City of Atl. City, 199 N.J. Super. 535, 541 (App. Div. 1985) (holding that the failure of Atlantic City and its municipal employees to provide bicycle lanes pursuant to its ordinance were entitled to immunity under the NJTCA); Bombace, 125 N.J. at 361-362 (holding that the City of Newark and its municipal employees were entitled to absolute immunity for failing to enforce smoke detector violations against a private landlord, which ultimately contributed to an apartment fire that killed four children); Reaves v. State, Dep't of Law & Pub. Safety, Div. on Civil Rights, 303 N.J. Super. 115, 119-120 (App. Div. 1997) (holding that the

Division on Civil Rights and its employees were entitled to absolute immunity for failure to enforce the New Jersey Law Against Discrimination).

Here, it is undisputed that Lifeguard Defendants are public employees, and that Long Branch enacted the Local Ordinance, which regulates the eleven beaches within the city limits. In pertinent part, the Local Ordinance prohibits a person from using "surfboards, rafts, or other swimming apparatus upon the protected public bathing beaches or in the waters adjacent thereto at any time lifeguards are on duty." Defs.' Facts at ¶ 14; Pl's. Facts at ¶ 17; see Defs.' Ex. H. In addition, the Local Ordinance also protects the waters "within 300 feet of a protected bathing area" by stating that "[a]ny person using a surfboard, raft or other swimming apparatus" within the aforementioned area "shall do so only after securing such surfboard, raft or swimming apparatus to his or her arm or leg with a surf leash and shall cease the use of such surfboard, raft or other swimming apparatus within that area upon being directed to by a lifeguard on duty." Id.

As a threshold matter, for the purposes of this motion, Plaintiff has shown that she was injured by a boogie board; Defendants offer no evidence suggesting otherwise. See Mrs. Pucca Dep.  However, the Court lacks sufficient information to conclude that boogie boards are prohibited as a "swimming apparatus" under the ordinance, as a matter of law, because Defendants provide testimony that contradicts such a finding. See George Dep. 57:4-8; Stimpson Dep. 30:9-11, 31:5-15; see also Griffith Report at 4-5 (expert report (1) noting that the ordinance in question specifically prohibits "surfboards and rafts and mentions 'other swimming apparatus,'" (2) arguing that "if the City wished to ban boogie boards and skimboards in their ordinance [it] probably would have mentioned them

specifically by name," and (3) claiming that "[m]any would not consider boogie boards and skimboards to be swimming apparatus.").

However, even if boogie boards and/or skimboards are prohibited by the Local Ordinance, the Court finds that Lifeguard Defendants are entitled to immunity to the extent that Plaintiff claims she was injured by Lifeguard Defendants' failure to enforce the Local Ordinance. See S.P., 428 N.J. Super. at 233 (stating that the immunity provided under N.J.S.A. 59:3-5 extends to ministerial as well as discretionary acts). Under such a theory of liability, Lifeguard Defendants' "critical causative conduct" would be their failure to enforce the Local Ordinance by allowing the use of a boogie board in the protected bathing area on the day of the incident. Since Lifeguard Defendants cannot be liable for their failure to enforce safety ordinances and regulations, the Lifeguard Defendants are immune for failure to enforce the Local Ordinance under N.J.S.A. 59:3-5. See Sharra v. City of Atl. City, 199 N.J. Super. 535, 542 (App. Div. 1985) (finding that "[t]o the extent that plaintiffs' claim is based upon *N.J.S.A.* 59:2-4 for the failure of Atlantic City to provide bicycle lanes pursuant to its ordinance, their argument must fall"); see also Saldana, 275 N.J. Super. at 496-497.

Nonetheless, Plaintiff argues that her claim survives because "the failure to enforce the [Local Ordinance] is not the gravamen of the negligent supervision claim asserted here." Pl's. Br. in Opp. to Summ. Judgm't at 12. Rather, Plaintiff maintains that she "only need[s] to prove that Defendants [were] negligen[t] in supervising the protected bathing area, a cause of action which [she] would have regardless of the fact that they failed to enforce their own Ordinance." Pl's. Reply Br. in Supp. of Partial Summ. Judgm't at 11-12.

Under the NJTCA, a plaintiff asserting a claim of negligent supervision of a recreational facility is not required to assert a failure to enforce a safety ordinance, regulation, or law. See Sharra, 199 N.J. Super. at 539. Indeed, a plaintiff asserting a claim of negligent supervision of a recreational facility is simply required to show that the public employee was at least ordinarily negligent. Id. Because Plaintiff argues that Lifeguard Defendants negligently allowed the use of various types of boards within close proximity of bathers, regardless of any individual ordinance publicly controlling such activity, Plaintiff's claim survives despite the fact that Lifeguard Defendants are immune for their failure to enforce the Local Ordinance. See, e.g., Saldana, 275 N.J. Super. at 499 (Where the city was a landowner, "[w]hile the defendants may be immune from any liability for failure to enforce N.J.A.C. 5:23–2.32(a) of the Code, a genuine issue of material fact still existed as to whether these defendants, in their capacity as landowners, negligently maintained their buildings in a dangerous condition.").

### i. Whether Defendant Long Branch Is Entitled To Immunity

Long Branch argues that it is entitled to immunity pursuant to N.J.S.A. 59:2-7 because "the City, as a public entity, cannot be liable for a failure to provide supervision at a recreational facility." Defs.' Br. at 4. N.J.S.A. 59:2-7 states that "[a] public entity is not liable for failure to provide supervision of public recreational facilities; provided, however, that nothing in this section shall exonerate a public entity from liability for failure to protect against a dangerous condition as provided in chapter 4." N.J.S.A. 59:2-7; see also N.J.S.A. 59:4-1(a) (defining "dangerous condition" as "[a] condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used"). Long Branch argues that it "can only be

held liable for a 'dangerous condition' at a recreational facility," Defs. Br. in Opp. to Summ. Judgm't at 3, and since Plaintiff does not assert a claim for a dangerous condition, Long Branch contends that it cannot be held vicariously liable for the acts or omission of the Lifeguard Defendants.

Plaintiff, however, argues that N.J.S.A. 59:2-2, not N.J.S.A. 59:2-7, governs the instant matter. N.J.S.A. 59:2-2 provides, in relevant part, that "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." N.J.S.A. 59:2-2. Thus, Plaintiff asserts that Long Branch is vicariously liable for the Lifeguard Defendants' negligent supervision of a recreational facility.

In response, Long Branch maintains that Plaintiff's reliance on N.J.S.A. 59:2-2 is misplaced because "[that] provision must be read in conjunction with section [N.J.S.A.] 59:2-7, [N.J.S.A.] 59:3-11 and [N.J.S.A.] 59:4-1, all of which establish that [Long Branch] is immune from a claim such as that being made by Plaintiffs."[9] Id.

---

[9]     N.J.S.A. 59:3-11, which pertains to recreational facilities, states that "[a] public employee is not liable for the failure to provide supervision of public recreational facilities. Nothing in this section exonerates a public employee for negligence in the supervision of a public recreational facility." Id. Again, Long Branch misconstrues the intent of this section. The immunity from liability extends only to those situations where the decision is made to provide no supervision at a recreational facility; it does not apply to a situation, such as here, where supervision is undertaken but the claim is that the supervision was negligently performed.

        N.J.S.A. 59:4-1 defines three terms used in Chapter 4, the chapter titled "Conditions of Public Property Liability of the Public Entity." (1) A "dangerous condition" is defined as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used; (2) "'protect against' includes repairing, remedying or correcting a dangerous condition, providing safeguards against a dangerous condition, or warning of a dangerous condition," and (3) "'public property' means real or personal property owned or controlled by the public entity, but does not include easements, encroachments and other property that are

In general, the New Jersey Supreme Court has explained, "The primary liability imposed on public entities is that of *respondeat superior*: when the public employee is liable for acts within the scope of that employee's employment, so too is the entity; conversely, when the public employee is not liable, neither is the entity." Tice, 133 N.J. at 355. In that connection, the New Jersey Supreme Court has stated that "N.J.S.A. 59:2-2 governs a plaintiff's cause of action when it turns on whether a public employee was ordinarily negligent in undertaking the action that caused plaintiff's injury." Ogborne v. Mercer Cemetery Corp., 197 N.J. 448, 457 (2009). Under the third prong of the negligent supervision test, Plaintiff's cause of action turns on whether the Lifeguard Defendants were negligent in their supervision of the Chelsea Beach.

Here, Long Branch's argument is unavailing. N.J.S.A. 59:2-2 governs the vicarious liability of a public entity for a public employee's ordinary negligence in the course of his employment duties, while N.J.S.A. 59:2-7 does not apply here, as it concerns a public entity's direct liability for failure to provide supervision and failure to protect against a dangerous condition of a public property.[10] If Lifeguard Defendants are found liable for

---

located on the property of the public entity but are not owned or controlled by the public entity." N.J.S.A. 59:4-1.

[10]     To the extent that Long Branch is arguing that it should not be held *directly* liable for Lifeguard Defendants' conduct, as opposed to vicariously liable, such a position seems supported:

> The duties and liabilities of public entities and public employees under the Act differ with respect to recreational facilities. N.J.S.A. 59:2-7 provides that a public entity's liability is linked to the dangerous condition of property under chapter four; however, under N.J.S.A. 59:3-11, a public employee's responsibility extends to "negligence in the supervision of a public recreational facility." Presumably, that dichotomy exists to protect the public from specific acts of negligence of a public employee, such as a lifeguard, but only in the event that the employee negligently undertakes supervision.

negligent supervision of a recreational facility in their capacity as municipal employees hired to undertake supervision of Chelsea Beach, then Long Branch is not entitled to immunity from vicarious liability pursuant to N.J.S.A. 59:2-7, because any other result would directly contravene the New Jersey Supreme Court's mandate that "when the public employee is liable for acts within the scope of that employee's employment, so too is the entity." Tice, 133 N.J. at 355. Accordingly, the Court finds that Long Branch is not entitled to immunity under N.J.S.A. 59:2-7 from being vicariously liable for the Lifeguard Defendants' negligent supervision.

### B. Merits of Plaintiff's Claim

Next, I reach the merits of Plaintiff's claim. Plaintiff argues that, as a matter of law, Lifeguard Defendants are liable for negligent supervision of the protected bathing area at Chelsea Beach on the day of the accident. In contrast, Stimpson and Callahan argue that Plaintiff, as a matter of law, cannot establish a claim of negligence supervision against them because they did not undertake supervision of Chelsea Beach at the time of the incident.

In order to establish liability based on negligent supervision, "a plaintiff must show that an injury was sustained (1) at a public recreational facility; (2) that a public employee undertook supervision of a public recreational facility, and (3) that the employee was

---

Chatman v. Hall, 128 N.J. 394, 425 n.3 (1992), superseded by statute on other grounds as stated in Velez v. City of Jersey City, 180 N.J. 284, (2004). However, Plaintiff does not argue that Long Branch should be found directly liable; rather, Plaintiff only argues that Long Branch should be held vicariously liable. Pl's. Br. at 5.

negligent in supervision of the public recreation facility."[11] Sharra, 199 N.J. Super. at 539; see Fleuhr, 303 N.J. Super. at 490; Lynch, 2010 WL 2696742, at * 2. As to the third prong of the analysis, the fundamental elements of a negligence claim are: (1) a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty, (3) injury to the plaintiff proximately caused by the breach, and (4) damages. Robinson v. Vivirito, 217 N.J. 1999, 208 (2014); see Toribio v. Pine Haven, LLC, No. 12-4975, 2014 WL 3865845, at *7 (D.N.J. Aug. 5, 2014). "The issues of whether a defendant owes a legal duty to another and the scope of that duty are generally questions of law for the court to decide." Robinson, 217 N.J. at 208.

As a threshold matter, the parties do not dispute that Plaintiff was injured at Chelsea Beach, which is a public recreational facility, and this Court has found *supra* that Plaintiff has established on this motion that Plaintiff was injured by a boogie board. Thus, the first prong of the negligent supervision analysis against all Defendants is satisfied here.

The Court will initially determine whether summary judgment may be granted for defendants Stimpson and Callahan before proceeding to the question of whether Plaintiff prevails on her summary judgment motion.

### i. Liability as to Stimpson and Callahan

---

[11]     As stated *supra*, pursuant to N.J.S.A. 59:3-11, "[a] public employee is not liable for the failure to provide supervision of public recreational facilities. Nothing in this section exonerates a public employee for negligence in the supervision of a public recreational facility." N.J.S.A. 59:3-11; see Sharra, 199 N.J. Super. at 539 ("If a municipal employee assumes supervision of a recreational facility, liability for negligent supervision may attach"); Fleuhr v. City of Cape May, 303 N.J. Super. 481 (App. Div. 1997), rev'd on other grounds, 159 N.J. 532 (1999); Lynch v. Thorwart, No. A-1404-09T1, 2010 WL 2696742, at * 2 (N.J. Super. Ct. App. Div. June 29, 2010).

Stimpson and Callahan contend that no liability attaches to them because neither had undertaken supervision of the beach at the time of Plaintiff's accident, and, therefore, as a matter of law, Plaintiff's claims against them fail on the second prong of the negligent supervision analysis.

First, Stimpson and Callahan argue that Stimpson "was not stationed at any one beach, but rather [he] floated around to different beaches during the day" of the incident. Defs.' Br. in Supp. of Summ. Judgm't at 7. Second, they argue that Callahan "was assigned to the Chelsea 1 stand on the date in question, but [he] has no[] memory of being present at the time of the accident," and "[i]t is therefore highly likely that Callahan was on break when [the incident] happened." Id. As such, Stimpson and Callahan argue that they were not supervising the scene at the time of the incident.

To establish supervision, "[T]here must be some conduct, no matter how minute, evidencing an intention to supervise by way of monitoring, entering into or becoming a part of the activity itself from which the injury sprang." Morris v. Jersey City, 179 N.J. Super. 460, 464 (App. Div. 1981); see also Fleuhr, 303 N.J. Super. at 490. Relatedly, "[l]iability for negligent supervision will not be imposed simply because there was an incidental undertaking at the same place only tangentially related to the recreational activity." Morris, 179 N.J. Super. at 464; see, e.g., Lynch, 2010 WL 2696742 at, *3 (finding that a City of Ocean City boat ramp attendant did not meet the second prong of the negligent supervision test because "[t]he ramp attendant's duties did not extend to supervising or patrolling the waterways"). As such, "a plaintiff must show a specific act or omission by a public employee who has undertaken actions which evidence involvement

24

in the activity conducted at the facility from which the injury sprang." <u>Fleuhr</u>, 303 N.J. Super. at 490 (citing <u>Sharra</u>, 199 N.J. Super. at 538).

Here, (1) Stimpson, who was the Head Lifeguard for the City of Long Branch at the time of Plaintiff's accident, states that he was not at Chelsea Beach at the time of Plaintiff's accident, and (2) Callahan, who was assigned to be a lifeguard for Chelsea Beach on the date of Plaintiff's accident, does not recall seeing or responding to Plaintiff's accident and posits that he could have been on break at the time of the accident. <u>See</u> Stimpson Dep. 13:19, 19:6; Callahan Dep. 22:12-13.

However, Stimpson and Callahan's statements do not establish that the two defendants did not undertake supervision of Chelsea Beach at the time of Plaintiff's accident. Rather, Stimpson's position as Head Lifeguard for the City of Long Branch on the date of Plaintiff's accident demonstrates that he took on significant supervisory duties over the recreational duties at the Long Branch beaches, including Chelsea Beach, on the date and at the time in question. Further, Callahan's statements that he does not recall being present and might have been on break at the time of Plaintiff's accident merely create a genuine issue of material fact as to whether his conduct satisfies the second prong of the negligent supervision analysis; they do not prove that Callahan did not undertake such supervision in the face of conflicting information placing him as one of the assigned lifeguards at Chelsea Beach on the date Plaintiff was injured at that beach. Moreover, as part of their job duties, Stimpson and Callahan were required to be actively engaged in monitoring the water and looking for potential high-risk situations on the beach and in the water. <u>See, e.g.</u>, Callahan Dep. 27:13-18. These are supervisory activities that are not merely tangentially related to the recreational activities at issue in this case. <u>See</u> <u>Morris</u>,

25

179 N.J. Super. at 464. Accordingly, a genuine issue of material fact exists as to whether Stimpson and Callahan indeed undertook supervision of Chelsea Beach at the time of Plaintiff's accident, and thus Defendants' motion for summary judgment as to the claims against Stimpson and Callahan are denied.

### ii. Plaintiff's Motion for Partial Summary Judgment

Finally, the Court addresses the merits of Plaintiff's motion for partial summary judgment. As stated above, the parties do not dispute that Plaintiff was injured at a public recreation facility and no evidence has been produced to suggest otherwise. However, the Court finds that Plaintiff has not established the second and third prongs of their negligent supervision claim against any defendant as a matter of law; genuine issues of material fact pervade the record as to which defendants specifically undertook supervision of the recreational activities that led to Plaintiff's accident and whether any of the defendants who did undertake supervision were negligent in so doing.[12]

Specifically, as to the second prong of the analysis, the Court notes that none of Lifeguard Defendants remember seeing Plaintiff's accident and that Plaintiff has not

---

[12]     Plaintiff argues that the Local Ordinance establishes a standard of care for Lifeguard Defendants even though Lifeguard Defendants are not liable for failure to enforce the Local Ordinance. Lifeguard Defendants, meanwhile, argue that the Local Ordinance does not establish a standard of care. While a municipal ordinance does not create a tort duty as a matter of law, see Luchejko v. City of Hoboken, 414 N.J. Super. 302, 321 (App. Div. 2010), the New Jersey Supreme Court has stated that a statute or ordinance may establish a standard of conduct only if the person attempting to bring the claim is "one of the class for whose benefit it was enacted" and if the breach of the statute or ordinance "was the efficient cause of the injury of which he complains". Carrino v. Novotny, 78 N.J. 335, 359 (1978); see Hoagland v. Gomez, 290 N.J. Super. 550, 554 (App. Div. 1996); see also Luchejko, 414 N.J. Super. at 321.

To the extent that this case law is applicable here, the Court has found *supra* that Plaintiff has not established that the presence of boogie boards in the protected swimming area necessarily violated the Local Ordinance.

established which lifeguard was manning the relevant lifeguard chair immediately before and during Plaintiff's accident and thus committed the purported negligent of act of failing to ensure that no boogie boards were in the protected bathing area at the time of Plaintiff's accident. <u>See</u> Callahan Dep. 22:12-13; Irving Dep. 28:7-11; Kimble Dep. 28:12-14. Therefore, Plaintiff has failed to establish as a matter of law that each of the Lifeguard Defendants specifically undertook supervision of the recreational facility at the time of, or immediately preceding, Plaintiff's accident.

As to the third prong of the analysis, while the Court does find that Lifeguard Defendants had a duty to use ordinary care to protect Plaintiff,[13] Plaintiff has not, on this motion, established that, as a matter of law, any of the Lifeguard Defendants breached that duty of care. Plaintiff appears to be arguing that the presence of a boogie board and/or a boogie boarder in the protected bathing area constitutes negligence *per se*, because such boards and boarders are prohibited from the protected bathing area under the Local Ordinance and because boogie boarding is an inherently dangerous activity. However, as stated above, the Court lacks sufficient information to determine whether the use of boogie

---

[13]     The New Jersey Supreme Court has held that "[t]he public policy of the State [of New Jersey] is that public entities providing paid lifeguard services and charging admission to their beaches do have a legal duty to use ordinary care to protect bathers in peril." <u>Fluehr</u>, 159 N.J. at 564; <u>see also</u> <u>Youn Wha Jung</u>, 2014 WL 7483599, at *10 (stating that the lifeguard defendants, "when stationed in their stands, [have] a duty to continually scan their zones for, among other thing, swimmers in distress"). The court stated to hold otherwise "would be bad law and bad public policy" because "[t]he Jersey Shore is the State's dominant tourist attraction," and it "would not want to have to tell tourists that our posted lifeguards have no legal duty to protect them." <u>Fluehr</u>, 159 N.J. at 562. Furthermore, the court noted that "most seashore municipalities choose to fund lifeguard programs despite the fact the N.J.S.A. 59:2-7 protects them from being sued for declining to do so." <u>Id.</u> at 563; <u>see</u> N.J.S.A. 59:2-7 ("A public entity is not liable for failure to provide supervision of public recreational facilities").

boards in the protected area constitutes a violation of the Local Ordinance, and even if it does, N.J.S.A. 59-4 and 59:3-5 immunize Defendants from being held liable for failure to enforce the Local Ordinance. Further, while multiple Lifeguard Defendants agree that a person riding a wave on a boogie board is ordinarily not allowed in the protected bathing area on days when the beach is crowded, the Beach Manager, George, and the Head Lifeguard, Stimpson, dispute that boogie boards are prohibited or even dangerous; they state that boogie boards were not generally prohibited in the protected bathing area and that boogie boards are not as dangerous as other boards, such as surf boards or skimboards.[14] See, e.g., George Dep. 57:4-8, 61:16-18; Stimpson Dep. 30:9-11, 31:5-15; see also Griffiths Report at 4 ("While I agree . . . that conflicting and dangerous activities should not be allowed in the safe, designated swimming area between the flags, I do not believe that boogie boarding is a conflicting or dangerous activity . . ."). Finally, there is a dispute of fact as to what type of board injured Plaintiff. Defendants dispute Plaintiff's contention that the board was made of wood. This dispute is material because a boogie board, which Plaintiff claims is what struck her, is considered more safe because it is generally made of foam, though a skimboard, which is generally considered more dangerous, is made of "thin wood." [15] Id. ("Boogie boards are typically considered safe because they are made of lighter foam instead of wood or hard plastic, and are most often used by children.").

---

[14]     Further, there does appear to be some dispute as to whether Plaintiff was indeed located in the protected bathing area at the time of her accident; none of the Lifeguard Defendants stated that they knew where Plaintiff was at the time of her accident and Callahan suggested that, based on what he had heard about the accident, he believed Plaintiff may have been outside of the blue flags when she was injured. See Callahan Dep. 33:22-34:3.

[15]     Griffiths goes on to state, "as far as Mrs. Pucca being hit by a skimboard, this is less likely to be true. Skimboarders stand on their boards while hydroplaning on a thin film

Thus, I do not find that even if Plaintiff was injured by a boogie board, that fact establishes Defendants' negligence. Therefore, viewing the evidence in the light most favorable to Defendants, the Court cannot find that the failure to prevent a boogie boarder from being in the protected swimming area was a breach of Lifeguard Defendants' duty of care as a matter of law.

In sum, Plaintiff has failed to establish, on this record, as a matter of law, that any of the Lifeguard Defendants specifically undertook supervision of the protected swimming area at the time of, or immediately preceding, Plaintiff's accident; further, Plaintiff has failed to establish, as a matter of law, that any specific acts or omissions on the part of any of the Lifeguard Defendants constituted a breach of their duty of care such that resulted in Plaintiff's accident. Rather, as discussed *supra*, these issues involve disputed material issues of fact that preclude summary judgment for either Stimpson and Callahan or Plaintiff. Therefore, Plaintiff's motion for partial summary judgment on their negligent supervision claim must be denied. See Orson, 79 F.3d at 1366; see, e.g., Rabinovich v. Annunziata, No. CIV.A. 11-03074 ES, 2013 WL 1192015, at *4 (D.N.J. Mar. 21, 2013) (denying the plaintiff's motion for summary judgment where the plaintiff failed to establish as a matter of law that the defendant was liable for negligence).

## **CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's motion for partial summary judgment is **DENIED**.  An appropriate order will follow.

---

of water at the top of the wash. If there was to be a collision between a skim boarder and another person, the two individuals would probably crash into each other while standing upright." Id.

Dated: March 25, 2015                              /s/ Freda L. Wolfson
                                                   The Honorable Freda L. Wolfson
                                                   United States District Judge